FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2015 MAR 12 AM 12: 24

WILLIAM W. BLEVINS
CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

# FELONY

### INDICTMENT FOR CONSPIRACY TO COMMIT HEALTH CARE FRAUD, CONSPIRACY TO DEFRAUD THE UNITED STATES AND TO RECEIVE AND PAY HEALTH CARE KICKBACKS, CONSPIRACY TO COMMIT WIRE FRAUD, HEALTH CARE FRAUD, WIRE FRAUD AND FORFEITURE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. **15 – 61** |
| | | |
| VERSUS | * | SECTION: **SECT. E MAG 5** |
| | | |
| LISA A. CRINEL | * | VIOLATIONS: |
| WILNEISHA HARRISON JAKES | | 18 U.S.C. § 1349 |
| HENRY EVANS | * | 18 U.S.C. § 371 |
| THREASA ADDERLEY | | 18 U.S.C. § 1347 |
| MICHAEL JONES | * | 18 U.S.C. § 1343 |
| PAULA JONES | | 18 U.S.C. § 2 |
| SHELTON BARNES | * | |
| JONATHON NORA | | |
| CARY PAYTON | * | |
| EVELYN ODOMS | | |
| SHEILA MATHIEU | * | |
| SUPRENIA WASHINGTON | | |
| ERICA EDWARDS | * | |
| ZELLISHA DEJEAN | | |
| CAREN BATTAGLIA | * | |
| SHEILA HOPKINS | | |
| ELESHIA WILLIAMS | * | |
| VERINESE SUTTON | | |
| PCAH, INC. a/k/a PRIORITY CARE AT | * | |
| HOME, INC. (PCAH) d/b/a ABIDE HOME | | |
| CARE SERVICES, INC. | * | |
| CLARA AITCH | | |
| WENDY ERVIN | * | |

\*   \*   \*

The Grand Jury charges that:

Fee _____
Process _____
X_ Dktd _____
CtRmDep _____
Doc. No. _____

1

## COUNT 1
## Conspiracy to Commit Health Care Fraud

**A.     AT ALL TIMES HEREIN:**

1.      The Medicare program (Medicare) was a federal health care program providing benefits to persons who were over the age of 65 or disabled.  Medicare was administered by the United States Department of Health and Human Services through its agency, the Centers for Medicare & Medicaid Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

2.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

3.      "Part A" of the Medicare program covered certain eligible home health care costs for medical services provided by a home health agency (HHA) to beneficiaries who required home health care services because of an illness or disability that caused them to be homebound. Payments for home health care medical services under Medicare Part A were typically made directly to an HHA or provider based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than directly to the beneficiary.

4.      "Part B" of the Medicare program covered certain physician services, outpatient and other services, that were medically necessary and was ordered by licensed medical doctors or other qualified health care providers.

5.      Physicians, clinics, and other health care providers, including HHAs, that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number."  A health care provider that was issued a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.  A

2

Medicare claim was required to set forth, among other things, the beneficiary's name and

Medicare number, the services performed, the date and charge for the services, and the names

and identification number of the physician or other health care provider who ordered the

services.

### Reimbursement for Home Health Services

6.     Medicare Part A, through a Medicare contractor, reimbursed 100% of the

allowable charges for participating HHAs providing home health care services only if the patient

qualified for home health care benefits.  A patient qualified for home health care benefits only if:

   a.   the patient was confined to the home, also referred to as homebound;

   b.   the patient was under the care of a physician who specifically determined that
        a need for home health care and established the Plan of Care ("POC"); and

   c.   the determining physician signed a certification statement specifying
        i.    that the beneficiary needed intermittent skilled nursing services, physical
              therapy, or speech therapy,
        ii.   the beneficiary was confined to the home,
        iii.  that a POC for furnishing services was established and periodically
              reviewed, and
        iv.   that the services were furnished while the beneficiary was under the care
              of the physician who established the POC.

7.     HHAs were reimbursed under the Home Health Prospective Payment System

("PPS").  Under PPS, Medicare paid HHAs a pre-determined base payment for each medically

necessary 60-day "episode of care."  Medicare adjusted the base payment according to the health

condition and care needs of the beneficiary.  Health Insurance Prospective Payment System

(HIPPS) rate codes represented specific sets of patient characteristics on which payment

determinations were made under the home health PPS.

8.     The ICD-9 was an acronym for "International Statistical Classification of

Diseases and Related Health Problems 9th Revision."  The ICD-9 is a publication from the

3

World Health Organization comprising a set of codes that are used worldwide to classify diseases and injuries. Medical facilities and providers use ICD-9 codes any time they receive patients. When physicians make their diagnoses, medical coders and billers assign the appropriate ICD-9 diagnosis code. The ICD-9 code is used with the Current Procedural Terminology (CPT) code, which is for procedures performed in medical facilities. These codes are used to generate bills for provider reimbursement in cases where patients have health insurance.

9.     The Case-Mix Group was a list of ICD-9 diagnosis codes that was developed based on research into utilization patterns among various provider types. Under the home health PPS, a Case-Mix adjusted payment for up to 60 days of care using a list of 153 Case-Mix classifications.

10.     Clinical assessment data was the basic input used to determine which Case-Mix Group applied to a particular patient. The data was gathered in an Outcome and Assessment Information Set (OASIS), an assessment tool used to measure and detail the patient's condition. The OASIS form was completed by a Registered Nurse affiliated with a HHA at the beginning of an episode of home health. The OASIS scoring generates a Home Health Resource Group (HRRG) score which is translated to a HIPPS code to be filed on the claim.

11.     The first six ICD-9 diagnosis codes input into the OASIS are weighted into the HIPPS score that determines the amount of reimbursement an agency receives. Some diagnosis codes fall into the 153 Case-Mix adjustments. Case-Mix diagnoses are weighted more heavily in the scoring and result in a higher HIPPS code. A higher HIPPS code results in a higher reimbursement for the agency. The HIPPS code was entered on the claim made by the HHA to Medicare.

4

12.     If a beneficiary was still eligible for care after the end of the first episode of care, a second episode could commence.  There were no limits to the number of episodes of home health benefits a beneficiary could receive as long as the beneficiary remained eligible.

13.     For beneficiaries for whom skilled nursing was medically necessary, Medicare paid for such skilled nursing provided by a HHA.  The basic requirement that a physician certify that a beneficiary was confined to the home or was homebound was a continuing requirement for a Medicare beneficiary to receive home health care benefits.

### Record Keeping Requirements

14.     Medicare Part A regulations required HHAs to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their Medicare patients and records documenting actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the HHA.  The medical records and documentation were required to be sufficient to permit a Medicare contractor or auditor to review the appropriateness of Medicare payments made to the HHA.

15.     Medicare required the following written records to document the appropriateness of Medicare home health care claims:

    a.  A POC that included

        - the physician order for home health care
        - medical diagnoses
        - types of services
        - frequency of visits
        - prognosis
        - rehabilitation potential
        - functional limitations
        - activities permitted
        - medications
        - treatments
        - nutritional requirements
        - safety measures

5

- discharge plans
- goals, and
- physician signature

b. a signed certification statement by an attending physician certifying that the patient was homebound and need the planned home health services, and

c. An OASIS assessment.

16.      Medicare Part A regulations required HHAs to maintain medical records of each visit made by a nurse, therapist, and home health aide to a beneficiary.   The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any teaching and the understanding of the patient, and any change in the patient's physical or emotional condition. The home health nurse, therapist, and aide were required to document the hands-on personal care provided to the beneficiary as the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury.

## Medicare Part B Physician Services for Home Health

17.      The Healthcare Common Procedure Coding System (HCPCS) was established to provide a standardized coding system for describing the specific items and services provided in the delivery of health care. Such coding is necessary for Medicare and other health insurance programs to ensure that insurance claims are processed in an orderly and consistent manner.

18.      Medicare established a usual, customary and reasonable fee for each service rendered, as described by its corresponding HCPCS code.  Codes were based upon the complexity of the service, the severity of the illness or injury and the average amount of time generally required to perform the service, and the fees paid are commensurate with the amount of work required.

6

19.     HCPCS G0180 and G0179 were codes for physician certification and recertifications, respectively, for Medicare-covered home health services that included contacts with the home health agency and review of reports of patient status required by physicians to affirm the initial implementation of the POC that meets a patient's needs, per the certification or recertification period.

20.     HCPCS G0181 was physician supervision of a patient receiving Medicare-covered services provided by a home health agency that required complex and multidisciplinary care modalities involving regular physician development and/or revision of POCs, review of subsequent reports of patient status, review of laboratory and other studies, communication, including telephone calls with other health care professionals involved in the patient's care, integration of new information into the medical treatment plan and/or adjustment of medical therapy, within a calendar month, lasting 30 or more minutes.

### The Defendants

21.     **PCAH, INC. a/k/a PRIORITY CARE AT HOME, INC. (PCAH)** was a Louisiana business incorporated on June 27, 2001, and began doing business as **ABIDE HOME CARE SERVICES, INC. (ABIDE)**. **ABIDE** was also a Louisiana corporation incorporated on or about September 11, 2002.  On about January 2, 1992, **ABIDE** received a Medicare provider number and became eligible to receive reimbursement from Medicare for services that **ABIDE** claimed to have provided to eligible beneficiaries, assuming that such services were medically necessary and had been properly ordered by a physician.  **ABIDE** was in the business of providing home health care to Medicare beneficiaries and beneficiaries of other health care benefit plans.

22.     **ABIDE** and its Board of Directors had a policy that stated that **ABIDE** and its Board of Directors assumed full legal authority and responsibility for the operation of **ABIDE**, and for the quality of care and the services provided.

23.     **LISA CRINEL (CRINEL)**, a resident of the Eastern District of Louisiana, incorporated, owned, operated, managed, and was a Director of **ABIDE**.

24.     **WILNESHA HARRISON JAKES (JAKES)**, a resident of the Eastern District of Louisiana, was the Chief Administrative Officer at **ABIDE**.

25.     **SHELTON BARNES (BARNES), HENRY EVANS (EVANS), THREASA ADDERLEY (ADDERLEY),** and **MICHAEL JONES**, were medical doctors licensed by the State of Louisiana who operated medical practices in New Orleans, Louisiana. **BARNES** employed an Advanced Registered Nurse Practitioner (ARPN), a non-physician practitioner (NPP) licensed by the State of Louisiana who operated under his supervision in his practice. **BARNES, EVANS, ADDERLEY** and **MICHAEL JONES** each applied for and were assigned Provider Numbers by Medicare that enabled them to file Part B claims for services they claimed they rendered to Medicare beneficiaries.

26.     **PAULA JONES** was a biller for **ABIDE** and was married to **MICHAEL JONES.**

27.     **JONATHAN NORA (NORA)**, a resident of River Ridge, Louisiana, was an office manager at **ABIDE**.

28.     **SHEILA MATHIEU (MATHIEU), SUPRENIA WASHINGTON (WASHINGTON), ERICA EDWARDS (EDWARDS), ZELLISHA DEJEAN (DEJEAN),** and **SHEILA HOPKINS (HOPKINS)** were Registered Nurses (RNs) at **ABIDE. DEJEAN** also, at times, held the position of Director of Nursing.

8

29.     **EVELYN ODOMS (ODOMS), CARY PAYTON (PAYTON)** and **CAREN BATTAGLIA (BATTAGLIA)** were Licensed Practical Nurses (LPN) at **ABIDE**.

30.     **ELESHIA WILLIAMS (WILLIAMS)** was a patient recruiter for **ABIDE**.

**B.     CONSPIRACY TO COMMIT HEALTH CARE FRAUD:**

31.     Beginning in or about November 1, 2008, and continuing until present, in the Eastern District of Louisiana and elsewhere, defendants **LISA CRINEL, WILNEISHA HARRISON JAKES, HENRY EVANS, THREASA ADDERLEY, MICHAEL JONES, PAULA JONES, SHELTON BARNES, JONATHAN NORA, EVELYN ODOMS, CARY PAYTON, CAREN BATTAGLIA, SHEILA MATHIEU, SUPRENIA WASHINGTON, ERICA EDWARDS, ZELLISHA DEJEAN, SHEILA HOPKINS,  ELESHIA WILLIAMS** and **PCAH, INC. a/k/a PRIORITY CARE AT HOME, INC. d/b/a ABIDE HOME CARE SERVICES, INC.** (collectively referred to as **"THE DEFENDANTS"** in this Count) and others known and unknown to the Grand Jury, willfully and knowingly did combine, conspire, confederate and agree together and with each other to knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money owned by and under the custody and control of Medicare in connection with the delivery of and payment for health care benefits and services, in violation of Title 18, United States Code, Section 1347.

## C.   PURPOSE OF THE CONSPIRACY:

32.     The purpose of the conspiracy was for **THE DEFENDANTS** to cause the fraudulent certifications and recertifications of medically unnecessary home health services for ineligible Medicare beneficiaries, the production of fraudulent documentation to support medically unnecessary home health services, the submission and concealment of false and fraudulent claims to Medicare, and the diversion of proceeds of the fraud for the personal use and benefit of **THE DEFENDANTS** and their co-conspirators.

## D.   MANNER AND MEANS OF THE CONSPIRACY:

33.     **WILLIAMS** and other known and unknown co-conspirators recruited Medicare beneficiaries so that they could be admitted at **ABIDE** and billed for skilled nursing services that were not medically necessary and not provided.  In return, **CRINEL** and **JAKES** paid illegal kickbacks to **WILLIAMS** and others for referring those beneficiaries.

34.     Through their operation of **ABIDE, CRINEL** and **JAKES** hired "House Doctors" to sign POCs for Medicare beneficiaries who had no legitimate medical necessity for home health services.  The House Doctors, including **BARNES, EVANS, ADDERLEY** and **MICHAEL JONES**, falsely signed POCs regardless of the beneficiary's needs, homebound status, or diagnoses.  In return, **BARNES, EVANS,** and **ADDERLEY** received monthly payments falsely characterized as medical consultant or director fees for which they provided no services other than fraudulently certifying Medicare beneficiaries for unnecessary home health services.  Instead of receiving monthly payments from **ABIDE** like the other House Doctors, **CRINEL** and **ABIDE** hired **PAULA JONES** and, thereafter, inflated salary payments to **PAULA JONES** represented **MICHAEL JONES'** fees for fraudulently certifying POCs for Medicare beneficiaries.

10

35.     **WILLIAMS** and other **ABIDE** marketers contacted **NORA** to confirm that the person fraudulently referred for home health was a Medicare beneficiary.  Once **NORA** determined the referred individual was a Medicare beneficiary, **NORA** scheduled a physician visit, usually with an **ABIDE** House Doctor, well knowing that the individual referral to **ABIDE** was by a Marketer, instead of the beneficiary's own health care professional.

36.     Because the House Doctors routinely and fraudulently certified and recertified ineligible Medicare beneficiaries for home health, **CRINEL** instructed indicted and unindicted co-conspirator employees of **ABIDE** to begin home health services for Medicare beneficiaries regardless of whether a physician certification, order or face-to-face evaluations had been obtained.

37.     Registered nurses, including but not limited to, **MATHIEU, EDWARDS, WASHINGTON, DEJEAN**, and **HOPKINS** were assigned to go to the homes of Medicare beneficiaries to complete the OASIS assessments that determined the necessary level of care required for the beneficiary and the reimbursement rate for the claims made by **ABIDE**.  When **MATHIEU, EDWARDS, WASHINGTON, DEJEAN** and **HOPKINS**, completed these OASIS assessments, they routinely and fraudulently included a group of diagnoses that were unrelated to the needs of the beneficiaries and included items suggesting the need for assistance with different activities of daily living in order to falsely inflate the reimbursement rates paid by Medicare to **ABIDE.  MATHIEU, EDWARDS, WASHINGTON, HOPKINS** and **DEJEAN** also fraudulently included other items in the OASIS assessment to falsely document the beneficiary's homebound status.

38.     After OASIS assessments were completed, Case Managers at **ABIDE** generated POCs reflecting falsely created assessments.  The POCs were given to the House Doctors to

11

falsely certify and recertify medically unnecessary episodes of home health. LPNs, including **ODOM, PAYTON** and **BATTAGLIA**, were assigned to beneficiaries. Skilled nursing visits by the LPNs were usually made at least one time per week and **ODOM, PAYTON** and **BATTAGLIA** routinely falsified documentation of visits to support the ongoing fraudulent billing by **PAULA JONES**, on behalf of **ABIDE**, of medically unnecessary home health services.

39. From about January 1, 2009, through on or about October 1, 2014, **ABIDE** fraudulently billed Medicare approximately $22,578,454.75 for home health services **ABIDE** falsely claimed to have provided to eligible Medicare beneficiaries, and Medicare paid **ABIDE** approximately $30,052,264.82.

All in violation of Title 18, United States Code, Section 1349.

**COUNT 2**
**Conspiracy to Pay and Receive Illegal Health Care Kickbacks**

**A.**    **AT ALL TIMES MATERIAL HEREIN:**

40. The allegations in Paragraphs 1 - 30 of Count 1 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

41. **VERINESE SUTTON** operated two unlicensed group homes that served as residences to several Medicare beneficiaries with psychiatric diagnoses.

**B.**    **THE OFFENSE**:

42. From in or around November 1, 2008, and continuing through March 2014, in the Eastern District of Louisiana, and elsewhere, defendants **LISA CRINEL, WILNEISHA HARRISON JAKES, SHELTON BARNES, HENRY EVANS, THREASA ADDERLEY, MICHAEL JONES, PAULA JONES, ELEISHA WILLIAMS, VERINESE SUTTON, CARY PAYTON** and **PCAH, INC. a/k/a PRIORITY CARE AT HOME, INC. (PCAH)**

**d/b/a ABIDE HOME CARE SERVICES, INC.,** did knowingly and willfully combine, conspire, confederate and agree with each other and others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

       a.     to knowingly and willfully solicit and receive remuneration, specifically, kickbacks and bribes, directly and indirectly, to overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare; in violation of Title 42, United States Code, Section 1320a-7b(b)(1); and

       b.     to knowingly and willfully offer and pay remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare; in violation of Title 42, United States Code, Section 1320a-7b(b)(2).

## C. PURPOSE OF THE CONSPIRACY:

43.     It was the purpose of the conspiracy was for **CRINEL, JAKES, BARNES, EVANS, ADDERLEY, MICHAEL JONES, PAULA JONES, WILLIAMS, SUTTON, PAYTON, ABIDE** and their co-conspirators to unlawfully enrich themselves by paying and

receiving illegal kickbacks and bribes in exchange for providing Medicare beneficiary information that was used to submit fraudulent claims to Medicare.

**D.**    **MANNER AND MEANS OF THE CONSPIRACY:**

44.    **CRINEL, JAKES, BARNES, EVANS, ADDERLEY, MICHAEL JONES, PAULA JONES, WILLIAMS, SUTTON, PAYTON, ABIDE** and other co-conspirators sought to accomplish the object and purpose of the conspiracy including, among other things, the following:

45.    **CRINEL** and **JAKES** obtained and maintained signature authority on the following corporate bank accounts for **ABIDE**:

    a.    Capital One Account XXXXXX7903 (7903)

    b.    Capital One Account XXXXXX7911 (7911)

    c.    State Bank and Trust Account XXXX1057 (1057)

From April 21, 2008, until August 27, 2013, Capital One Account 7903 was the account into which claim reimbursement payments from Medicare were deposited.  From September 6, 2013 until January 31, 2014, State Bank and Trust Account 1057 was the account into which claim reimbursement payments from Medicare were deposited.  In March 2008, Capital One Account No. 7911 was opened as **ABIDE'S**  payroll account.

46.    After reimbursements paid on behalf of Medicare to **ABIDE** were deposited into the Capital One and State Bank accounts, **CRINEL** and **JAKES** transferred funds from these accounts into several other accounts.

47.    Marketers, including **WILLIAMS,** and other known and unknown co-conspirators, recruited Medicare beneficiaries, and caused Medicare beneficiaries to be recruited,

14

so that they could be referred to **ABIDE** for home health services that were medically unnecessary.

48.     **ABIDE, CRINEL** and **JAKES** referred Medicare beneficiaries to **BARNES, EVANS, ADDERLEY**, and **MICHAEL JONES** so that they would falsely and fraudulently certify and recertify the beneficiaries for home health services to be provided by **ABIDE. BARNES, EVANS, ADDERLEY**, and **MICHAEL JONES** fraudulently signed home health POC's for ineligible beneficiaries so that **ABIDE** could falsely bill Medicare for home health services that were medically unnecessary. In return, **CRINEL, JAKES**, and **ABIDE** fraudulently paid and caused payments to be made to **BARNES, EVANS, ADDERLEY**, and **MICHAEL JONES**, disguised as payments to his wife, **PAULA JONES**, who **CRINEL** hired as a biller at **ABIDE**, in exchange for physician's orders, medical assessments and home and office visits purportedly conducted by these physicians and the ARPN associated with **BARNES**.

49.     In addition to physicians, **ABIDE, CRINEL**, and **JAKES** paid employees of **ABIDE, WILLIAMS**, RNs, **PAYTON** and other LPNs, Aides, recruiters and marketers between approximately $150 and $500 for each referral of a Medicare beneficiary who **ABIDE** fraudulently qualified for home health services eventually billed by **PAULA JONES** and another biller on behalf of **ABIDE**.

50.     **CRINEL, JAKES**, and **ABIDE** paid an operator of an unlicensed psychiatric group home a salary for her routine transmittal of Medicare beneficiary information for each new resident that she housed. **CRINEL, JAKES**, and **ABIDE** paid **SUTTON** for each individual Medicare beneficiary or resident she referred to **ABIDE**.

15

51.     Among other things, **ABIDE**, **CRINEL**, and **JAKES** used the funds paid by Medicare that were deposited into **ABIDE'S** bank accounts to pay patient recruiters.

**E.     OVERT ACTS:**

52.     In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Eastern District of Louisiana, and elsewhere, the following overt acts:

53.     On about September 21, 2011, **CRINEL, JAKES,** and **ABIDE** paid and caused to be paid, check number 40739 in the amount of $943.50 from **ABIDE'S** Capital One Account No. 7911, to **WILLIAMS**, in exchange for **WILLIAMS** referring Medicare beneficiaries for home health services. At least $500 of the payment represented a beneficiary referral fee.

54.     From about March 17, 2008, until about March 14, 2014, **CRINEL, JAKES,** and **ABIDE** paid and caused to be paid a total of about $130,316.71 to an unlicensed group home operator, in exchange for the operator's routine referral of her Medicare-covered psychiatric residents to **ABIDE** for medically unnecessary home health services.

55.     On about April 8, 2010, **ABIDE, CRINEL,** and **JAKES** paid and caused to be paid, check number 40585 in the amount of $3,200 from **ABIDE'S** Capital One Account No. 7911, to a known recruiter, "Marketer A," in exchange for her referral to **ABIDE** of Medicare beneficiaries for home health services.

56.     On about April 26, 2012, **ABIDE, CRINEL,** and **JAKES** paid and caused to be paid, check number 35022 in the amount of $300 from **ABIDE'S** Capital One Account No. 7903 to **CARY PAYTON**, in exchange for his referral to **ABIDE** of an insurance beneficiary for home health services.

57.     On about May 31, 2013 **ABIDE, CRINEL,** and **JAKES** paid and caused to be paid check number 35908 in the amount of $450 from **ABIDE'S** Capital One Account No. 7903 to an RN, in exchange for her referral of three insurance beneficiaries to **ABIDE**.

58.     On about June 3, 2013, **ABIDE, CRINEL,** and **JAKES** paid and caused to be paid check number 35912 in the amount of $400 from **ABIDE'S** Capital One Account No. 7903 to "Marketer B" in exchange for her referral to **ABIDE** of an insurance beneficiary for home health services.

59. On about each of the following dates, **ABIDE, CRINEL,** and **JAKES** paid and caused to be paid, $2,000 to **EVANS** for the referral of Medicare beneficiaries and for fraudulently signing Physician Orders and falsified 485/POC certifications and recertifications for Medicare beneficiaries, in whose names **ABIDE** submitted claims to Medicare:

   a. December 29, 2011
   b. January 26, 2012
   c. February 23, 2012
   d. March 30, 2012
   e. December 31, 2012
   f. January 31, 2013

60. Between February 2011 and February 2014, **ABIDE, CRINEL,** and **JAKES** paid **EVANS** approximately $56,000 for which **EVANS** provided no services other than the referral of patients to **ABIDE.**

61. On about each of the following dates, **ABIDE, CRINEL** and **JAKES** paid and caused to be paid, $3,500 to **BARNES** for the referral of Medicare beneficiaries and for fraudulently signing Physician Orders and falsified 485/POC certifications and recertifications for Medicare beneficiaries, in whose names **ABIDE** submitted claims to Medicare:

   a. October 20, 2011
   b. November 17, 2011
   c. December 29, 2011
   d. January 26, 2012
   e. February 23, 2012
   f. March 30, 2012
   g. April 30, 2012
   h. May 31, 2012
   i. June 30, 2012

62. **ABIDE, CRINEL,** and **JAKES** paid **BARNES** approximately $42,500, in 2011, and approximately $38,500 in 2012, pursuant to annual Medical Director agreements even though the contracts explicitly restricted **BARNES'** payment to $25,000 annually.

63. Between about April 2008 and March 2014, **ABIDE, CRINEL,** and **JAKES** paid **BARNES** approximately $209,000 for which **BARNES** provided no services other than the referral of patients to **ABIDE.**

64. On about each of the following dates, **ABIDE, CRINEL,** and **JAKES** paid and caused to be paid, $1,500 to **ADDERLEY** for the referral of Medicare beneficiaries and for fraudulently signing Physician Orders and falsified

485/POC certifications and recertifications for Medicare beneficiaries, in whose names **ABIDE** submitted claims to Medicare:

   a.  February 27, 2012
   b.  July 12, 2012
   c.  August 3, 2012
   d.  September 17, 2012

65.   Between about November 2011, and February 2014, **ABIDE, CRINEL,** and **JAKES** paid **ADDERLEY** approximately $48,500 for which **ADDERLEY** provided no services other than the referral of patients to **ABIDE**.

66.   On about May 29, 2013, **JAKES** raised **PAULA JONES'** salary to reflect a net increase of $3,500 per month. **PAULA JONES** was given the raise to compensate **MICHAEL JONES** for the referral of Medicare beneficiaries and for fraudulently signing Physician Orders and falsified 485 certifications and recertifications for Medicare beneficiaries, in whose names **ABIDE** submitted claims to Medicare.

67.   Between May 31, 2013, and March 25, 2014, **PAULA JONES** received from **ABIDE**, bimonthly checks in the approximate amounts of between $3,274 and $3,304, $35,000 of which reflected the salary increase to compensate **MICHAEL JONES**, that either **PAULA JONES** or **MICHAEL JONES** deposited into their personal accounts.

68.   On about April 30, 2013, **ABIDE, CRINEL,** and **JAKES** paid and caused to be paid, check number 35853 in the amount of $400 from **ABIDE'S** Capital One Account No. 7903 to **SUTTON** in exchange for her referral to **ABIDE** of a Medicare beneficiary for home health services.

69.   In January 2014, **SUTTON** was contacted by an individual at a psychiatric day program about a patient who needed a place to live. **SUTTON** agreed to take the patient, EvLa, into her group home.

70.   Upon taking EvLa into her group home, **SUTTON** contacted **ABIDE** to refer EvLa in return for a referral fee. After personnel at **ABIDE** confirmed EvLa's Medicare eligibility, **SUTTON** was instructed to contact **MICHAEL JONES**.

71.   **SUTTON** contacted **MICHAEL JONES** in order for **MICHAEL JONES** to sign orders for home health at **ABIDE**. **SUTTON** scheduled an appointment for EvLa to see **MICHAEL JONES**. On about January 23, 2014, a driver employed by **MICHAEL JONES** picked up EvLa from **SUTTON'S** group home and transported her to his medical offices.

72.    On about March 17, 2014, **ABIDE, CRINEL,** and **JAKES** paid and caused to be paid, check number 50510 in the amount of $600 from **ABIDE'S** State Bank Account No. 1057 to **SUTTON** in exchange for her referral of EvLa and SaHa, another group home resident to **ABIDE** for home health services.

All in violation of Title 18, United States Code, Section 371.

### COUNTS 3 THROUGH 22
### Health Care Fraud

**A.    AT ALL TIMES MATERIAL HEREIN:**

73.    The allegations in Paragraphs 1 through 30 of Count 1 and Paragraph 41 of Count 2 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

**B.    HEALTH CARE FRAUD:**

74.    Beginning on or about January 1, 2009, and continuing through on or about October 1, 2014, in the Eastern District of Louisiana and elsewhere, the defendants, **LISA CRINEL, HENRY EVANS, THERESA ADDERLEY, SHELTON BARNES, MICHAEL JONES, EVELYN ODOMS, ERICA EDWARDS, ZELLISHA DEJEAN, SUPRENIA WASHINGTON, SHEILA MATHIEU, CAREN BATTAGLIA, SHEILA HOPKINS,** and **PCAH, INC. a/k/a PRIORITY CARE AT HOME, INC. (PCAH) d/b/a ABIDE HOME CARE SERVICES, INC.** and/or others known and unknown to the Grand Jury, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud Medicare and to obtain, by means of false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, the Medicare program.

75.    It was part of the scheme and artifice to defraud that when information on a Medicare beneficiary was brought to **ABIDE** by a recruiter, an **ABIDE** office employee assigned a House Doctor or a Non-Physician Practitioner (NPP) affiliated with **ABIDE** to see the beneficiary. If the beneficiary was new to **ABIDE**, a Client Profile/Referral containing the

beneficiary's contact information was sent to the House Doctor or NPP. If a beneficiary had a primary care physician who would not recertify home health, the House Doctor or NPP was instructed to see that beneficiary so that a recertification could be done. If the beneficiary was established at **ABIDE**, a Form 485 was often provided to the House Doctor or NPP from an earlier home health episode so that the House Doctor or NPP would have the beneficiary's contact information and medical demographics. Office staff assigned beneficiaries to **ABIDE** House Doctors and NPPs well knowing that **ABIDE**, **CRINEL**, and **JAKES** paid referral fees to marketers and recruiters in return for providing Medicare beneficiaries and that the home health referrals did not originate with a medical necessity for home health services for the referred beneficiaries.

76.     It was further part of the scheme and artifice to defraud that **ADDERLEY** routinely signed orders for home health and 485 certifications for psychiatric Medicare beneficiaries residing in group homes. **ADDERLEY** ordered the home health from **ABIDE** well-knowing that beneficiaries were not homebound and had no medical necessity for skilled nursing. The diagnoses assigned to beneficiaries by **ADDERLY** often had no relation to the individual and were, instead, intentionally designed to inflate Medicare reimbursements to **ABIDE**.

77.     It was further part of the scheme and artifice to defraud that, in addition to certifying **ABIDE** patients for medically unnecessary home health services, **BARNES**, **MICHAEL JONES, EVANS,** and **ADDERLEY** falsely assigned Case Mix diagnoses to patients on the 485s that fraudulently inflated Medicare's reimbursement to **ABIDE**.

78.     It was further part of the scheme and artifice to defraud that **ABIDE** nurses, including **WASHINGTON, EDWARDS,** and **MATHIEU** fraudulently recertified patients for

20

home health by recording false changes in medications and exacerbations of medical conditions that did not occur and did not require skilled nursing.

79.    It was further part of the scheme and artifice to defraud that **ODOMS** participated in 60-day conferences for the purpose of assessing the need for continued home health well knowing that recertifications were routinely based on medically insignificant or falsified bases, that patients did not require continued skilled nursing, and that patients were not homebound.

### Patient JoBi

80.    It was further part of the scheme and artifice to defraud that JoBi, a group home resident, was a Medicare beneficiary with mental health diagnoses who received treatment at a psychiatric partial hospitalization day program.  **ABIDE** fraudulently billed for providing eleven episodes of home health for JoBi based upon falsely created OASIS assessments prepared by **HOPKINS**, seven of which **ADDERLEY** falsely certified as medically necessary.

81.    It was further part of the scheme and artifice to defraud that **ADDERLEY** documented seeing JoBi on only two occasions – April 11, 2013 and March 25, 2014. **ADDERLEY** ordered no tests and consulted with no medical professionals caring for JoBi, including his treating psychiatrist, who saw JoBi weekly at the day program, and relied on no objective medical documentation or consultation in assigning medical diagnosis codes.

82.    It was further part of the scheme and artifice to defraud that from about March 26, 2013, through April 9, 2014, **ADDERLEY** falsely and fraudulently recertified JoBi for home health services by diagnosing JoBi with Case Mix ICD-9 diagnoses 401.9 (hypertension NOS), and 369.20 (low vision), among other diagnoses, and by certifying that JoBi was homebound.

83. It was further part of the scheme and artifice to defraud that **HOPKINS** falsely and fraudulently documented performing skilled nursing visits on behalf of **ABIDE** for JoBi during the periods JoBi was certified for home health with **ABIDE**.

84. It was further part of the scheme and artifice to defraud that, after the execution of federal search warrants on **ABIDE** on March 25, 2014, **ABIDE** abruptly discharged JoBi to home/self-care on about April 8, 2014, despite JoBi having been certified for home health for eleven episodes at **ABIDE** between approximately April 10, 2012 and March 21, 2014, and even though the last skilled visit indicated minimal progress toward JoBi's goals. Neither **ABIDE**, **ADDERLEY,** nor **HOPKINS** provided JoBi or his group home caregiver with any discharge instructions or documentation.

85. It was further part of the scheme to defraud that **ABIDE** fraudulently billed Medicare $10,375.05 and was paid $9,834.27 for seven episodes of home health for JoBi based upon falsified OASIS assessments performed by **HOPKINS**, POCs fraudulently certified by **ADDERLEY**, and purported skilled nursing visits **HOPKINS** falsely claimed she performed, when **ABIDE** and **CRINEL** well knew and should have known that the services billed were medically unnecessary and for a patient who was not homebound.

### Patient GePr

86. It was further part of the scheme and artifice to defraud that GePr, a group home resident, was a Medicare beneficiary with mental health diagnoses who received treatment at a psychiatric partial hospitalization day program. **ABIDE** fraudulently billed for providing twenty-six episodes of home health for GePr based upon falsely created OASIS assessments prepared by **HOPKINS**, twenty-four of which were falsely certified as medically necessary by **ADDERLEY**.

22

87.     It was further part of the scheme and artifice to defraud that **ADDERLEY** documented that she saw GePr on only one occasion – April 11, 2013.  **ADDERLEY** ordered no tests and consulted with no medical professionals caring for GePr, including his treating psychiatrist who saw GePr weekly at the day program, and relied on no objective medical documentation or consultation in assigning medical diagnosis codes.

88.     It was further part of the scheme and artifice to defraud that from about January 28, 2010, through April 8, 2014, **ADDERLEY** falsely and fraudulently recertified GePr for home health services by diagnosing GePr with Case Mix ICD-9 diagnoses 369.20 (low vision) and 536.9 (stomach function disorder NOS), among other diagnoses, and by certifying that GePr was homebound.

89.     It was further part of the scheme and artifice to defraud that **HOPKINS** falsely and fraudulently documented performing skilled nursing visits on behalf of **ABIDE** for Medicare beneficiary GePr during the periods GePr was certified for home health with **ABIDE**.

90.     It was further part of the scheme and artifice to defraud that on about August 21, 2013, **HOPKINS** and **DEJEAN** created a false and fraudulent case conference and 60-day summary for GePr containing falsified diagnoses, medical conditions and exacerbations that were based upon no objective medical data or history and was created solely to falsely recertify GePr for home health.

91.     It was further part of the scheme and artifice to defraud that, after the execution of federal search warrants on **ABIDE** on March 25, 2014, **ABIDE** abruptly discharged GePr to home/self-care on about April 8, 2014, despite GePr having been certified for home health for twenty-six episodes at **ABIDE** between approximately January 28, 2010 and March 8, 2014, and even though the last skilled visit indicated fair progress toward GePr's goals.  Neither **ABIDE**,

23

**ADDERLEY**, nor **HOPKINS** provided GePr or his group home caregiver with any discharge instructions or documentation.

92. It was further part of the scheme to defraud that **ABIDE** fraudulently billed Medicare $35,925.05 and was paid $41,528.47 for twenty-four episodes of home health for GePr based upon falsified OASIS assessments performed by **HOPKINS**, POCs fraudulently certified by **ADDERLEY**, purported skilled nursing visits **HOPKINS** falsely claimed she performed, and 60-day conferences falsely documenting fabricated exacerbations and complications of GePr's medical condition by **HOPKINS** and **DEJEAN**, when **ABIDE** and **CRINEL** well knew and should have known that the services billed were medically unnecessary and for a patient who was not homebound.

### Patient DeHo

93. It was further part of the scheme and artifice to defraud that DeHo was a Medicare beneficiary who was referred to **ABIDE** by a group home operator who received a kickback from **CRINEL** for her referral of DeHo to **ABIDE**. **ABIDE** fraudulently billed for providing thirty-two episodes of home health for DeHo based upon falsely created OASIS assessments prepared by **MATHIEU**, **DEJEAN**, and others, eight of which were falsely certified as medically necessary by **ADDERLEY**.

94. It was further part of the scheme and artifice to defraud that on about September 5, 2012, **MATHIEU** falsely completed an OASIS and on September 10, 2012, **MATHIEU** signed a 485 for the home health episode September 10, 2012 through November 8, 2012, for DeHo listing Case Mix ICD-9 Diagnoses 716.89 (arthropathy NEC Multi), 356.9 (hereditary and idiopathic peripheral neuropathy), 369.20 (low vision), 438.22 (hemiplegia affecting

24

nondominant side), and 311 (depressive disorder NEC) that was signed and falsely certified by Physician X.

95.     It was further part of the scheme and artifice to defraud that, although no skilled visits were conducted during the home health episode September 10, 2012 through November 8, 2012, because DeHo either was not home or was out of the service area, **ABIDE** billed Medicare for providing skilled nursing visits to DeHo on the following dates:

      a)    September 22, 2012
      b)    September 28, 2012
      c)    October 4, 2012
      d)    October 12, 2012
      e)    October 18, 2012
      f)    October 22, 2012

96.     It was further part of the scheme and artifice to defraud that DeHo was under the care of a physician who could no longer treat DeHo.  In order to continue DeHo in medically unnecessary home health, on January 5, 2013, **MATHIEU** created physician orders transferring DeHo from her treating physician to **ADDERLEY** and falsely initiated the recertification of DeHo based upon a bogus exacerbation of hypertension.

97.     It was further part of the scheme and artifice to defraud that there were no documented visits by **ADDERLEY** to DeHo and, instead, all **ADDERLEY** possessed related to DeHo's were copies of **ABIDE**-prepared documentation.  **ADDERLEY** ordered no tests and consulted with no medical professional caring for DeHo.

98.     It was further part of the scheme and artifice to defraud that after **ABIDE** transferred DeHo to **ADDERLEY**, **MATHIEU** fraudulently completed an OASIS and signed a POC for home health episode January 8, 2013 through March 8, 2013, listing Case Mix ICD-9 Diagnoses 716.89 (arthropathy NEC Multi), 356.9 (hereditary and idiopathic peripheral neuropathy), 369.20 (low vision), 438.22 (hemiplegia affecting nondominant side), and 311

25

(depressive disorder NEC) that was signed and falsely certified by **ADDERLEY**. **ABIDE** fraudulently billed Medicare for this home health episode even though **ADDERLEY** did not perform, and **ABIDE** did not have, the required face-to-face evaluation that must be performed and completed by a new physician admitting a new patient to home health.

99.     It was further part of the scheme to defraud that **ABIDE** fraudulently billed Medicare $8,925.04 and was paid $16,361.50 for eight episodes of home health based upon falsified OASIS assessments performed by **DEJEAN**, **MATHIEU** and others and POCs fraudulently certified by **ADDERLEY**, when **ABIDE** and **CRINEL** well knew and should have known that the services billed were medically unnecessary and for a patient who was not homebound.

### Patient ArGi

100.    It was further part of the scheme and artifice to defraud that ArGi was a Medicare beneficiary who resided alone in a senior living community. **ABIDE** fraudulently billed for providing thirty episodes of home health for ArGi based upon falsely created OASIS assessments prepared by **WASHINGTON, DEJEAN, EDWARDS, MATHIEU** and others, sixteen of which were falsely certified as medically necessary by **BARNES** and seven of which were falsely certified as medically necessary by **MICHAEL JONES**. **WASHINGTON, DEJEAN, EDWARDS, MATHIEU** and others, falsely documented homebound status when they well knew and should have known that ArGi was not homebound, did not suffer from all of the diagnosed illnesses they listed on documentation, and did not need home health services.

101.    It was further part of the scheme and artifice to defraud that from about May 24, 2009, through March of 2014, **WASHINGTON, DEJEAN, EDWARDS, MATHIEU,** and others created false and fraudulent OASIS and POCs including diagnoses of illnesses that ArGi

26

did not have.  An unindicted physician known to the grand jury, **BARNES** and **JONES** falsely

and fraudulently recertified ArGi for home health episodes by diagnosing ArGi with Case Mix

ICD-9 diagnoses 281.0 (pernicious anemia), 330.1 (cerebral lipidosis),  369.20 (low vision),

536.9 (stomach function disorder NOS), 401.9 (hypertension NOS), 358.1 (myasthenic

syndromes in diseases classified elsewhere), 714.0 (rheumatoid arthritis), 357.1 (polyneuropathy

in collagen vascular disease), among other diagnoses, and by certifying that ArGi was

homebound.

102.    It was further part of the scheme and artifice to defraud that through thirty

episodes of home health, hypertension was identified as the primary diagnosis for eleven

episodes even though ArGi's blood pressure was habitually within normal limits and, on the rare

occasion when ArGi's blood pressure was not within normal limits, no notification was made to

a physician even though the plan of care required such a notification.

103.    It was further part of the scheme and artifice to defraud that despite two previous

home health episodes wherein ArGi's blood pressure was within normal limits, on about

September 11, 2010, **EDWARDS** falsely initiated the recertification of ArGi based upon a

falsified exacerbation of hypertension.

104.    It was further part of the scheme and artifice to defraud that **BARNES** recertified

ArGi for sixteen episodes of home health between May 19, 2010 and January 2, 2013, without

ever seeing ArGi, without having any knowledge of ArGi's medical condition, and without ever

having conducted a face-to-face with ArGi.

105.    It was further part of the scheme and artifice to defraud that **BARNES** billed

Medicare Part B for performing CPT Code G0181(home health care plan oversight) for ArGi on

ten occasions between November 22, 2010 and October 22, 2012, even though he never saw or

27

treated ArGi, never maintained a patient file for ArGi, and never performed the elements of CPT Code G0181 for ArGi.

106.   It was further part of the scheme and artifice to defraud that **MICHAEL JONES** recertified ArGi for seven episodes of home health between January 3, 2013 and April 27, 2014. For the initial recertification on January 3, 2013, **MICHAEL JONES** signed a 485 for ArGi before **MICHAEL JONES** ever saw or treated ArGi as a patient.

107.   It was further part of the scheme and artifice to defraud that **MICHAEL JONES** assigned diagnoses on ArGi's 485s that were not medically supported in **MICHAEL JONES'** treatment or documentation of treatment of ArGi.

108.   It was further part of the scheme and artifice to defraud that **ODOMS** falsely and fraudulently documented skilled nursing visits she made to ArGi beginning on May 24, 2009 and continuing until about April 25, 2014. **ODOMS** falsely reported that she educated ArGi on the false diagnoses supporting home health when, in fact, all **ODOMS** did on the nursing visits to ArGi that **ABIDE** billed as skilled nursing visits was to take ArGi's vital signs.

109.   It was further part of the scheme and artifice to defraud that during each home health episode, **ODOMS** participated in 60-day conferences with **ABIDE** staff to discuss the need for ongoing home health services for ArGi and falsely supported the need for ongoing home health services well knowing that ArGi had no medical necessity for home health.

110.   It was further part of the scheme to defraud that **ABIDE** fraudulently billed Medicare $17,420 and was paid $35,122.03 for sixteen episodes of home health based upon falsified OASIS assessments performed by **WASHINGTON, DEJEAN, EDWARDS, MATHIEU,** and others and POCs fraudulently certified by **BARNES** and **ABIDE** fraudulently billed Medicare $8,863.46 and was paid $14,501.63 for seven episodes of home health based

28

upon falsified OASIS assessments performed by **WASHINGTON, DEJEAN, EDWARDS, MATHIEU**, and others and POCs fraudulently certified by **MICHAEL JONES**, when **ABIDE** and **CRINEL** well knew and should have known that the services billed were medically unnecessary and for a patient who was not homebound.

### Patient KiSt

111.    It was further part of the scheme and artifice to defraud that KiSt, a Medicare beneficiary, resided with her minor child and received home health from **ABIDE** from July 23, 2011 until January 13, 2013. KiSt was discharged on March 13, 2013. **ABIDE** fraudulently billed for providing ten episodes of home health for KiSt based upon falsely created OASIS assessments and POCs, all of which were falsely certified as medically necessary by **BARNES**.

112.    It was further part of the scheme and artifice to defraud that the NPP employed with **BARNES** made a home visit with KiSt in July 2011. The NPP documented a blood pressure of 120/70 on a copy of the first page of a POC already signed by **BARNES** and **DEJEAN**.

113.    It was further part of the scheme and artifice to defraud that **BARNES** never submitted a face-to-face evaluation to **ABIDE**, a document required by Medicare in order for Medicare to reimburse for the home health episode.

114.    It was further part of the scheme and artifice to defraud that **DEJEAN** completed an OASIS for KiSt falsely reflecting a primary diagnosis of 401.9 (hypertension NOS), a Case-Mix ICD-9 diagnosis, when **DEJEAN** had taken only one blood pressure reading, and other Case-Mix ICD-9 diagnoses of 369.2 (low vision 2 eyes NOS), 250.6 (DMII neuropathy uncontrolled), and 281.1 (Vitamin B12 deficiency anemia NEC), that KiSt's safety was compromised because of vision, that KiSt's physician was notified of the patient's risk of falls,

29

that KiSt was confused at times, that KiSt needed assistance with oral medications, and that a caregiver provided assistance with activities of daily living,

115.    It was further part of the scheme and artifice to defraud that **DEJEAN** and **BARNES** fraudulently signed the POC on about July 25, 2011, for the start of care for home health services at **ABIDE** well knowing that there was no physician orders and no face-to-face evaluation performed by **BARNES**.

116.    It was further part of the scheme and artifice to defraud that **DEJEAN**, and other nursing staff, **BARNES, CRINEL,** and **ABIDE**, never possessed or were aware of medical documentation supporting the diagnoses listed in the OASISs and the POCs prepared for KiSt.

117.    It was further part of the scheme and artifice to defraud that **BARNES** never maintained a patient file for KiSt, nor did **BARNES** ever bill Medicare Part B for any office visits made with KiSt or any POCs he oversaw, signed and certified.

118.    It was further part of the scheme and artifice to defraud that, even though KiSt was diagnosed with hypertension for every episode of home health at **ABIDE**, KiSt was never seen by **BARNES**, was seen only once by **BARNES'** NPP on June 27, 2012, and had been discharged from **ABIDE** on March 13, 2013, **BARNES**, on April 3, 2013, ordered medication used to treat major depressive, anxiety and panic disorders that had a common side effect of elevated blood pressure.

119.    It was further part of the scheme to defraud that **ABIDE** fraudulently billed Medicare $8,879.86 and was paid $19,666.24 for ten episodes of home health based upon falsified OASIS assessments performed by **DEJEAN** and others and POCs fraudulently certified by **BARNES**, when **ABIDE** and **CRINEL** well knew and should have known that the services billed were medically unnecessary and for a patient who was not homebound.

**Patient JeJo**

120.    It was further part of the scheme and artifice to defraud that JeJo was a developmentally delayed Medicare beneficiary diagnosed with Downs Syndrome who resided with his sister and received home health from **ABIDE** from March 13, 2013 until January 9, 2014.

121.    It was further part of the scheme and artifice to defraud that **MATHIEU** and others completed OASIS assessments for JeJo falsely reflecting diagnoses of 369.20 (low vision 2 eyes NOS) and 716.89 (arthropathy), Case-Mix ICD-9 diagnoses.

122.    It was further part of the scheme and artifice to defraud that on about March 13, 2013, **EVANS** discharged JeJo from Touro Infirmary after treatment of an abdominally related, non-surgical condition.  **EVANS** specifically identified **ABIDE** for post hospitalization care to monitor vital signs, assist with dietary oversight and to have physical therapy.  Because JeJo could not be located, **ABIDE** was not able to evaluate JeJo for services until about March 20, 2013.

123.    **ABIDE** fraudulently billed for providing five episodes of home health for JeJo based upon physician orders and falsely created OASIS assessments prepared by **MATHIEU** that did not support home health.

124.    It was further part of the scheme and artifice to defraud that on about May 22, 2013, **EVANS** medically cleared JeJo to participate in an adult non-medical day care program with no restrictions.

125.    It was further part of the scheme and artifice to defraud that on about August 28, 2013, **EVANS** completed a Request for Medical Eligibility Determination and prescribed and certified Medicaid services for intermediate institutional and developmental care for JeJo.  On

31

the certification completed by **EVANS**, he certified that Home/Community Based Services adequately met the needs of JeJo, including most activities of daily living, and indicated that JeJo had a normal physical examination and no visual impairment.

126.   It was further part of the scheme and artifice to defraud that **BATTAGLIA** falsely documented skilled nursing visits by "teaching on disease processes" that JeJo did not have.  **BATTAGLIA** falsely stated in a 60-day conference that JeJo's homebound status was evident even though **BATTAGLIA** knew or should have known that JeJo left home each day for a day program and had frequent outings with his caregivers and continually witnessed him returning home from these outings.  **BATTAGLIA** also falsely documented that JeJo had complications with arthritis, a condition from which JeJo did not suffer, representations fraudulently used to recertify JeJo for medically unnecessary home health services.

127.   It was further part of the scheme and artifice to defraud that, despite justifying the need for skilled nursing home health services for JeJo for five episodes, **ABIDE** abruptly discharged JeJo from home health on about January 9, 2014, because JeJo was receiving daily personal care services that assisted JeJo with activities of daily living.

128.   It was further part of the scheme and artifice to defraud that for two home health episodes, **EVANS'** Physician Orders reflected a need for recertification based upon a change of medication when the only medication change was to add Tylenol as needed, a change that does not require skilled nursing provided by a home health agency.

129.   It was further part of the scheme and artifice to defraud that between about March 20, 2013, and about November 13, 2013, OASIS assessments prepared by **MATHIEU** and others, skilled nursing visits documented by **BATTAGLIA** and others, and 485 POCs certified by **EVANS** were all fraudulently completed for JeJo by documenting false diagnoses, the need

32

for skilled nursing, and the need for assistance with activities of daily living, and JeJo's homebound status when **EVANS, MATHIEU, BATTAGLIA** and other **ABIDE** employees, including skilled nurses and aides, well knew that JeJo had full time personal care services provided by Medicaid, lived with a family member, and did not need skilled or aide home health services.

130.    It was further part of the scheme to defraud that **ABIDE** fraudulently billed Medicare $12,880.03 and was paid $9,634.93 for five episodes of home health provided to JeJo based upon the above-described falsified documentation, when **ABIDE** and **CRINEL** well knew and should have known that the services billed were medically unnecessary and for a patient who was not homebound.

131.    It was further part of the scheme and artifice to defraud that between about January 1, 2009, and October 2012, **BARNES** fraudulently billed Medicare approximately $297,952 for providing Medicare Part B services for CPT Codes G0180 and G0181 and was paid approximately $162,783.

132.    It was further part of the scheme and artifice to defraud that between about January 1, 2009, and July 2014, because **BARNES** referred patients to **ABIDE** for home health services in return for payments from **ABIDE** and **CRINEL** and fraudulently signed POCs for beneficiaries so that **ABIDE** and **CRINEL** could bill Medicare for home health services that were medically unnecessary, and in some cases not rendered, **ABIDE** and **CRINEL** billed Medicare $7,325,092 and was paid $10,687,445.

133.    It was further part of the scheme and artifice to defraud that between about January 1, 2009, and October 2012, **EVANS** fraudulently billed Medicare approximately

$67,750 for providing Medicare Part B services for CPT Codes G0179, G0180, and G0181 and was paid approximately $26,708.

134. It was further part of the scheme and artifice to defraud that between about January 1, 2009, and May 2014, because **EVANS** referred patients to **ABIDE** for home health services in return for payments from **ABIDE** and **CRINEL** and fraudulently signed POCs for beneficiaries so that **ABIDE** and **CRINEL** could bill Medicare for home health services that were medically unnecessary, and in some cases not rendered, **ABIDE** and **CRINEL** billed Medicare approximately $1,160,744 and was paid approximately $1,546,320.

135. It was further part of the scheme and artifice to defraud that between about April 2009, and July 2014, because **ADDERLEY** referred patients to **ABIDE** for home health services in return for payments from **ABIDE** and **CRINEL** and fraudulently signed POCs for beneficiaries so that **ABIDE** and **CRINEL** could bill Medicare for home health services that were medically unnecessary, and in some cases not rendered, **ABIDE** and **CRINEL** billed Medicare approximately $529,119 and was paid approximately $566,906.

136. It was further part of the scheme and artifice to defraud that between January 2013, and May 2014, **MICHAEL JONES** fraudulently billed Medicare approximately $10,635 for providing Medicare Part B services for CPT Codes G0180 and G0181 and was paid approximately $2,658.

137. It was further part of the scheme and artifice to defraud that between about May 29, 2013, and May 2014, because **MICHAEL JONES** referred patients to **ABIDE** for home health services in return for payments to his wife, Paula Jones, from **ABIDE** and **CRINEL** and fraudulently signed POCs for beneficiaries so that **ABIDE** and **CRINEL** could bill Medicare for

home health services that were medically unnecessary, and in some cases not rendered, **ABIDE** and **CRINEL** billed Medicare approximately $237,155 and was paid approximately $295,413.

138.    In order to execute and attempt to execute the scheme, and to accomplish the purposes of the scheme, the defendants **CRINEL, ABIDE, BARNES, EVANS, MICHAEL JONES, ADDERLEY, ODOMS, WASHINGTON, HOPKINS, MATTHIEU, EDWARDS** and **DEJEAN** and others known and unknown to the grand jury, committed and caused others to commit the following acts of fraudulent billing to Medicare for episodes of home health listed below:

| COUNT | BENEFICIARY | EPISODE/ PART B BILLING | AMOUNT BILLED | AMOUNT PAID | DEFENDANTS |
|---|---|---|---|---|---|
| 3 | JoBi | 03/26/13 – 05/24/13 | $1,375.00 | $1,427.04 | **CRINEL, ABIDE, ADDERLEY, HOPKINS** |
| 4 | JoBi | 05/25/13 – 07/23/13 | $1,650.00 | $1,427.04 | **CRINEL, ABIDE, ADDERLEY, HOPKINS** |
| 5 | JoBi | 11/21/13 – 01/19/14 | $1,650.01 | $1,249.79 | **CRINEL, ABIDE, ADDERLEY, HOPKINS** |
| 6 | GePr | 07/16/12 – 09/13/12 | $1,250.00 | $1,470.35 | **CRINEL, ABIDE, ADDERLEY, HOPKINS** |
| 7 | GePr | 03/13/13 – 05/11/13 | $1,250.00 | $1,427.04 | **CRINEL, ABIDE, ADDERLEY, HOPKINS** |
| 8 | GePr | 07/11/13 – 09/08/13 | $1,650.01 | $1,803.78 | **CRINEL, ABIDE, ADDERLEY, HOPKINS, DEJEAN** |
| 9 | GePr | 01/07/14 – 03/07/14 | $1,650.01 | $1,735.95 | **CRINEL, ABIDE, ADDERLEY** |
| 10 | DeHo | 09/10/12 – 11/08/12 | $1,000.00 | $2,200.81 | **CRINEL, ABIDE, ADDERLEY, MATHIEU** |
| 11 | DeHo | 01/08/13 – 03/08/13 | $  875.00 | $2,179.41 | **CRINEL, ABIDE, ADDERLEY, MATHIEU** |
| 12 | ArGi | 07/18/10 – 09/15/10 | $1,125.00 | $2,324.19 | **CRINEL, ABIDE, BARNES,** |

| COUNT | BENEFICIARY | EPISODE/PART B BILLING | AMOUNT BILLED | AMOUNT PAID | DEFENDANTS |
|-------|-------------|------------------------|---------------|-------------|------------|
| | | | | | WASHINGTON, ODOMS |
| 13 | ArGi | 11/15/10 – 01/13/11 | $1,000.00 | $2199.28 | CRINEL, ABIDE, BARNES, EDWARDS, ODOMS |
| 14 | ArGi | 11/22/10 | $132.22 | $84.11 | BARNES |
| 15 | ArGi | 03/09/12 – 05/07/12 | $1,125.00 | $2,200.81 | CRINEL, ABIDE, BARNES, ODOMS |
| 16 | ArGi | 08/31/13 – 10/29/13 | $1,200.01 | $2,135.82 | CRINEL, ABIDE, MICHAEL JONES |
| 17 | ArGi | 12/29/13 – 02/26/14 | $1,200.01 | $2,055.49 | CRINEL, ABIDE, MATHIEU, ODOMS, MICHAEL JONES |
| 18 | JeJo | 07/18/13 – 09/15/13 | $2,240.01 | $1,759.06 | CRINEL, ABIDE, EVANS, BATTAGLIA |
| 19 | JeJo | 09/16/13 – 11/14/13 | $2,710.01 | $1,427.04 | CRINEL, ABIDE, EVANS, BATTAGLIA |
| 20 | KiSt | 07/23/11 – 09/20/11 | $1,000.00 | $1,690.12 | CRINEL, ABIDE, BARNES, DEJEAN |
| 21 | KiSt | 11/14/12 – 01/12/13 | $625.00 | $2,012.74 | CRINEL, ABIDE, BARNES |
| 22 | KiSt | 01/13/13 – 03/13/13 | $625.00 | $1,657.97 | CRINEL, ABIDE, BARNES |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 23
## Conspiracy to Commit Wire Fraud

A.    **AT ALL TIMES MATERIAL HEREIN:**

139.    Paragraphs 21, 23, and 24 of Count 1 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

140.    **CRINEL** was an owner, operator, incorporator and director of LACE, Inc. (LACE).  LACE operated as a reception hall.

141.    Between approximately Fall 2004, until about May 8, 2010, Jakes was enrolled at Jackson State University in Jackson, Mississippi.

36

142.    British Petroleum (BP) was a company whose activities included oil exploration and production in the United States and elsewhere and whose subsidiaries included BP Exploration and Production, Inc.

143.    On or about April 20, 2010, an explosion and fire occurred on the Deepwater Horizon, an oil rig in the Gulf of Mexico that had been drilling an exploration well.  The resulting oil spill, with which BP was associated, caused oil pollution across the Gulf of Mexico.

144.    From in or about May 2010, through on or about August 23, 2010, BP operated a process for submission directly to BP and resolution by BP of claims of individuals and businesses for costs, damages, and other losses incurred as a result of the oil discharges due to the Deepwater Horizon incident.

145.    In or about June 2010, BP established the Gulf Coast Claims Facility (GCCF) for the purpose of administering, mediating, and settling certain claims of individuals and businesses for costs, damages, and other losses incurred as a result of the Deepwater Horizon incident.  The GCCF was administered by Kenneth R. Feinberg, a fund administrator responsible for decisions relating to the administration and processing of claims by the GCCF.  On or about August 23, 2010, the GCCF began receiving and processing claims.

146.    On or about August 6, 2010, BP Exploration established the Deepwater Horizon Oil Spill Trust, an irrevocable common law trust formed under Delaware law, to receive and to distribute funds that BP Exploration promised to provide for the payment of certain types of claims, costs, and expenses, including but not limited to, those resolved by the GCCF.

147.    **CLARA AITCH** and **WENDY ERVIN** were full-time employees of ABIDE.

**B.    THE CONSPIRACY:**

148.    Beginning in or about November 2010, and continuing until in or about December 2011, in the Eastern District of Louisiana, and elsewhere, the defendants **LISA CRINEL**, **CLARA AITCH (AITCH)**, and **WENDY ERVIN (ERVIN)** and others known and unknown to the Grand Jury, knowingly and willfully conspired to devise and intended to devise a scheme and artifice to defraud the GCCF and to obtain money by means of false and fraudulent representations, by transmitting and causing to be transmitted by means of wire communication in interstate commerce, from New Orleans, Louisiana, to Georgia, writings, signs, signals, pictures and sounds for the purpose of executing said scheme and artifice, in violation of Title 18, United States Code, Section 1343.

**C.    OVERT ACTS:**

149.    In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Eastern District of Louisiana and elsewhere, the following overt acts:

150.    On about November 16, 2010, **CRINEL** sent an email to an accountant in Georgia identifying Jakes, **ERVIN** and **AITCH** as the individuals on whose behalf **CRINEL** wanted BP claims filed.

151.    On about November 16, 2010, the Georgia accountant emailed **CRINEL** to tell her that he needed identification documents and a letter for the three claimants.

152.    On about November 18, 2010, **CRINEL** prepared false and fraudulent letters that were signed by Jakes, **AITCH** and **ERVIN** and addressed to the Gulf Coast Relief Fund. Each letter falsely stated that Jakes, **AITCH** and **ERVIN** had been employed full time with LACE – The Reception Place for 15 months. The letters also stated that Jakes', **AITCH'S** and **ERVIN'S** hours had been drastically cut because of the BP disaster.

153.    On about November 18, 2010, the falsified letters and identification documents of Jakes, **AITCH** and **ERVIN** were emailed to the Georgia accountant.

154.    On about November 23, 2010, the Georgia accountant transmitted via email address riseuplisa@yahoo.com the falsified BP claims that had been fraudulently filed on behalf of **AITCH** and **ERVIN**.

155.    On about December 6, 2010, the GCCF sent **ERVIN** a check in the amount of $12,300. **CRINEL** rode with **ERVIN** to the bank where **ERVIN** cashed the check. **CRINEL** instructed **ERVIN** to give a portion of her check to **CRINEL** because Jakes' BP claim had been denied.

156.    On about December 6, 2010, the GCCF sent **AITCH** a check in the amount of $13,500. **CRINEL** instructed **AITCH** to give a portion of the funds **AITCH** received.

157.    On about December 10, 2010, **CRINEL** deposited a $4,000 cash kickback into the Georgia accountant's bank account in return for preparing and submitting the fraudulent claims.

158.    On about December 14, 2010, **AITCH** wrote **CRINEL** a check in the amount of $5,000.

159.    On about October 20, 2011, the GCCF sent **ERVIN** a check in the amount of $5,000.

160.    On about December 9, 2011, the GCCF sent **AITCH** a check in the amount of $5,000.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 24 THROUGH 26
## Wire Fraud

A.    **AT ALL TIMES MATERIAL HEREIN**:

161.    The allegations in Sections A and C of Count 23 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

B.    **THE SCHEME:**

162.    From on or about November 16, 2010 until on or about December 14, 2010, in the Eastern District of Louisiana and elsewhere, **LISA CRINEL** knowingly and willfully devised and intended to devise a scheme and artifice to defraud the GCCF and obtain money and

39

property from the GCCF by means of false and fraudulent promises, pretenses, and representations.

163.    It was part of the scheme and artifice to defraud that on or about November 23, 2010, **CRINEL** submitted and caused to be submitted, fraudulent applications to the GCCF seeking compensation for loss of earnings resulting from the Deepwater Horizon oil spill for the individuals listed below by falsely and fraudulently creating falsified payroll documentation and letters establishing employment at LACE, Inc., when in fact, as **CRINEL** well knew, the listed individuals did not earn the wages reported to the GCCF or suffer any lost wages as reported to the GCCF.

| Counts | Date | Transaction |
|--------|------|-------------|
| 24 | November 23, 2010 | Fraudulent BP Application for Jakes |
| 25 | November 23, 2010 | Fraudulent BP Application for Aitch |
| 26 | November 23, 2010 | Fraudulent BP Application for Ervin |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## NOTICE OF HEALTH CARE FRAUD FORFEITURE

1.    The allegations contained in Counts 1 through 22 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures to the United States pursuant to the provisions of Title 18, United States Code, Section 982(a)(7).

2.    As a result of the offenses alleged in Counts 1 through 22, defendants, **LISA A. CRINEL, WILNEISHA HARRISON JAKES HENRY EVANS, THREASA ADDERLEY, MICHAEL JONES, PAULA JONES, SHELTON BARNES, JONATHON NORA, CARY PAYTON, EVELYN ODOMS, SHEILA MATHIEU, SUPRENIA WASHINGTON, ERICA EDWARDS, ZELLISHA DEJEAN, CAREN BATTAGLIA, SHEILA HOPKINS, ELESHIA WILLIAMS, VERINESE SUTTON, PCAH, INC. a/k/a PRIORITY CARE AT HOME, INC. (PCAH) d/b/a ABIDE HOME CARE SERVICES, INC., CLARA AITCH,**

**WENDY ERVIN**, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any and all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses as a result of the violations of Title 18, United States Code, Sections 1347 and 1349, and Title 42, United States Code, Sections 1320a-7(b)(1); 1320a-7(b)(2), which are Federal Health Care offenses within the meaning of Title 18, United States Code, Section 24, including but not limited to:

a. $25,343.48 in U.S. Currency from the seized AXA Equitable Life Insurance Company Accounts, Incentive Life Insurance Contract #152323401, in the name of Wilneisha Harrison;

b. $171,420.43 in U.S. Currency from the seized AXA Equitable Life Insurance Company Accounts, Incentive Life Insurance Contract #152323394, in the name of Lisa A. Crinel;

c. $4,479.73 in U.S. Currency from the seized AXA Equitable Life Insurance Company Accounts, Athena Universal Life II Insurance Contract #156212556, in the name of Wilneisha Harrison;

d. $175,380.46 in U.S. Currency from the seized Invesco Investment Services, Inc., Account #9031259142, in the name of Lisa A. Crinel;

e. $147,090.62 in U.S. Currency from the seized Invesco Investment Services, Inc., Account #903125943, in the name of Lisa A. Crinel;

f. $174,130.60 in U.S. Currency seized from State Bank & Trust Company Account #570001057, in the name of PCAH dba Abide Home Care Services, Inc.;

g. Property currently recorded in the name of Lisa A. Crinel and described as follows: A certain lot or portion of ground, together with all the buildings and improvements thereon, and, all rights, ways, means, privileges, servitudes, prescriptions, appurtenances and advantages thereunto belonging or in anywise appertaining, situated in the Parish of St. John the Baptist, State of Louisiana, known as Lot 59, Square F of Belle Terre Two, St. Andrews Estates, Phase II, as shown on plat of re-subdivision by Harold J. Flynn, P.L.S., dated November 30, 1985 and filed as COB 332, folio 363, Entry No. 174074 on the Office of the Clerk of Court in and for the Parish of St. John the Baptist, State of Louisiana. The improvements thereon bear the Municipal Number: 31 Muirfield Drive, LaPlace, Louisiana;

h. Property currently recorded in the name of Lisa A. Crinel and described as follows: A certain piece or portion of ground, together with all the buildings and

improvements thereon, and all of the rights, ways, privileges, servitudes, advantages and appurtenances thereunto belonging or in anywise appertaining, situated in the State of Louisiana, Third District of the City of New Orleans, in that part thereof known as Lake Forest (formerly known as the LaKratt Tract and New Orleans, Lakeshore Land Company Subdivision) and according to a Plan of Resubdivision by John D. Luecke. Surveyor, dated July 25, 1977, approved by the City Planning Commission on February 3, 1978, the approval of which is recorded in COB 749, folio 344, said piece or portion of ground is designated as Lot 1B-3B2C, Section 20, in the area bounded by Lamb Road, Morrison Road, Martin Drive (formerly Joffre Road) and Interstate Highway I-10 and said Lot 1B-3B2C measures 200 feet front on Martin Drive, 199.90 feet in width in the rear, with a depth of 264.54 feet on Interstate Highway I-10 side and a depth of 258.33 feet on the side of Lot 1B-3B2D. According to Plan of Resubdivision, said Lot 1B-3B2C commences at a distance of 425.42 feet from the intersection of Martin Drive and Morrison Road. According to a Topographic and Utility Plan made by the Office of Gandolfo, Kuhn, Luecke & Associates, dated August 15, 1977, last revised April 19, 1982, said lot has the same designation and measurements referred to above. Property delineated on survey by Gilbert, Kelly & Couturie, dated 25 February 2003. The improvements thereon bear the Municipal Number: 6960 Martin Drive, New Orleans, Louisiana.

i.   The Assorted Described Jewelry:

- SS/18kwg 36mm Rolex DATEJUST having 18kwg diamond bezel, rhodium waves diamond dial, diamond #6 & #9, optical date, S/S jubilee link bracelet;

- Swarovski Mufasa;

- Swarovski Adrienne Angel;

- S/Silver Yurman Designs GTS Streamline octagonal link bracelet having all links octagonal with polished sides & carved rope edges, push button clasp, 8.5" length;

- Swarovski Snow White;

- Swarovski Winnie The Pooh;

- S/Silver John Hardy square black sapphire woven cufflinks having pave' set blk saph stones in a cushion center with woven edges and back;

- S/Silver John Hardy GTS square black chalcedony & white sapphire woven ring with center having a faceted blk chlcdy being bezel set w/row of prong set whsap all around, woven sides & shank w/polished bottom (no saph weight given);

- S/Silver & 18kyg John Hardy naga carved dragon scale lrg width chain bracelet having carved scale chain designs (like dragon scales) in middle area, w/push button larges scales clasp having yg accents w/row of yg dots around both ends;

- SS/18kyg John Hardy Naga ring having large s/sil round top w/yg dragon scale accents, yg dot border on either side of top, s/sil shank w/carved scale design, smooth/polished shank bottom;

- S/Silver John Hardy Designs "BEDEG" black sapphire dome ring having pave' blksaph center (graduated-wider in center) w/polished ribbed design on each side & down shank, 1-carved row each side@bottom & polished bottom shank, size 7;

- John Hardy s/silver "BEDEG" large hoop earrings being polished ribbed design, post back;

- S/Sil Yurman Cerise Mabe pearl & diamond ring having 17mm round mabe pearl bezel set on top surrounded by pave' dias in blk rhod, cable split shank, D=1.36tw;

- S/Silver Yurman Designs prasiolite & diamond albion ring having 17mm cushion prasiolite bezel set in s/s w/row of pave dias all around, s/s cable split shank size 7;

- S/Silver John Hardy blk saph classic chain medium square pendant having pave' set blk sapphires in center square with pol bezel, chain design outer edges and chain design bail;

- S/Silver John Hardy square black chalcedony & woven cufflinks having blkchalcdny center with woven edges and back;

- S/Silver John Hardy square black sapphire woven cufflinks having pave' set blk saph stones in a cushion center with woven edges and back;

- 18kwg Mikimoto blk south sea pearl stud earrings having 8mm BSS pearl, A+ quality;

- S/Silver 14mm black onyx cushion ring w/split shank having cushion shape faceted bonyz being bezel set in pol s/s, s/s cable design split shank;

- Steel/RGP LDS Gucci 126sm bracelet watch having white mother of pearl date dial w/12 dia indicators, lumen hands, sec hand, polished case/bezel, multi row two-tone bracelet having brushed outer links & polished inner links, deployment buckle;

- S/Silver John Hardy medium chain bracelet having s/s woven chain design w/pave' dia push button clasp, D=.30tw-7.5" (medium length) 7.3mm chain;

- 18kwg 13-10mm black Tahitian s/sea pearl strand having an 18kwg satin finish diamond dot clasp 17" length;

- S/Silver & 18kyg John Hardy Designs small naga carved dragon scale chain & pave' dia bracelet being carved scale chain designs (like dragon scales) in middle area, push button pave' dia clasp w/yg accents, row of yg dots at both ends, D=.14tw;

- SS/18kyg John Hardy Designs naga carved dragon scale medium chain bracelet w/ameth, having carved scale chain designs (like dragon scales) in middle area, push button pve ameth clasp having row of yg dots around both ends;

- S/Silver John Hardy xsmall chain bracelet with pave' black saph push button clasp – 7" med length;

- S/Silver John Hardy square black chalcedony & woven cufflinks having blkchalcdny center with woven edges and back;

- SS Hardy squared pave' diamond enhancer having pave dias set on front with ss smooth bezel and having ss chain design all around edges, ss chain bail D=.85tw (no chain);

- S/Silver John Hardy lg chain bracelet having s/s chain design with pave' diamond push button clasp – 7.75" (medium length) D-.62tw; 11mm chain;

- S/Silver John Hardy classic chain kepang lava medium chain bracelet being woven chain design with pave' blk saph push button clasp;

- 18kw/yg dia engage ring having a 1.04rad yellow dia ctr surrounded by pve ylw dias w/pve wht dia outer edges, pve wht dia open shank w/single rd ylw dia bezel set ea side and f/b, wht = .35tw, ylw = .23tw;

- S/Silver & 18kyg John Hardy Designs naga round drop pdt on chain nk open work scale circle pdt w/18kyg dot border & snap open bail 36" chain w/various links, lobster clasp;

- SS/18kyg John Hardy naga small circle drop er, circle w/open work scale design & 18kyg dot border drops from small open work scale circle, post back;

- S/silver John Hardy blue sapphire bracelet having s/s medium woven chain with pave' blue saph push button clasp;

44

- SS & 14kyg Yurman Design cufflinks being a curbed rectangular shape of ribbed s/s with 14kyg accents on sides;

- S/Silver & 18kyg JHardy naga dragon dangling bracelet, multi row chain bracelet with dangling scales, 18yg accents on tail end cap and scales, dragon head clasp;

- SS/18kwg 41mm Rolex DATEJUST II having rhodium 10rd diamond dial with optical date, 18kwg fluted bezel, s/s oyster link bracelet;

- S/silver Yurman "Labyrinth: shrimp pave' diamond earrings having 2 cable rows and 2-pve' dia rows looped together at center, D=.88tw lever back posts;

- S/Silver Konstantino 2-row mop carved link bracelet having rolo links w/1-row having 3-faceted mop in crvd/beaded links w/1-row having dangling larger mop t/dro/rd/marquise shapes, crvd toggle clasp, 7.5" length;

- S/Silver Konstantino mop carved link necklace having cushion shaped faceted mop in crvd/beaded links w/small crvd rd links & larger crvd/beaded links in between each, crvd toggle clasp, 18" length;

- S/Silver Konstantino oval mop carved dangle earrings having at post a rd crvd floral design then dangling ovl faceted mop w/crvd prongs, beaded row all around, post backs;

- S/Silver Konstantino oval mop carved ring having in center a ovl faceted mop in center w/crvd prongs (n/s), crvd open sides & shank, size 6.5;

- S/Silver Yurman Designs medium oval link chain necklace having alternating polish & cable links, 18.4" length;

- S/Silver Yurman Designs 20mm pave' diamond infinity enhancer cushion center all pave' dias w/infinity design all around edge being polished & cable rows, cable bail, D=1.47tw;

- Michele Watches 16mm polished 7 row bracelet;

- Steel LDS Michele Serein 16 watch having round roman numeral m-o-p dial, date @ 6, lumen hands, second hand, zig zag diamond bezel, 36x34mm case, 88rd dias=.50tw (no bracelet or strap);

- S/Silver Konsantino Treasures cufflinks having rectangular shaped top w/lattice carved design, thin rope border, engraved edges/sides & backs;

45

- Steel LDS Michele art deco diamond watch having rectangular diamond dial, lumen hands, second hand, zig zag diamond bezel, 33x35mm steel case 298rd dias=1.07tw (no bracelet or strap);

- Michele Watches 18mm polished 7 row bracelet;

- S/Silver Yurman Designs GTS 50mm armory cross enhancer with diamonds D=1.92tw, LK holiday party, 2013;

- Yellow/pvd LDS Gucci bracelet watch having square brown "G" dial w/s/s indicators, ypvd hands (no second hand) polished sq case, polished large open link bracelet, bar clasp;

- 22" SS/14ky Yurman box chain;

- S/Sil Yurman GTS 4mm modern cable ID chain link bracelet having rectangular polished and brushed cable chain links throughout, black pave' diamond bar in center, snap down hidden clasp, D=2.118tw, 8" length;

- SS/18ky crossover earring bonded gold;

- SS/18kyg 26mm Rolex DATEJUST with white mop 10rd diamond dial w/optical date, 18kyg fluted bezel, 18kyg/SS jubilee bracelet;

- S/Silver John Hardy medium chain bracelet having S/S woven chain design w/pave' dia push button clasp, D=.30tw – 7.5" (medium length), 7.3mm chain;

- Steel LDS Michele "Mini Urban" chronograph bracelet watch having silver Arabic dial, 1slvr subdial, s/s hands, s/s diamond bezel, polished case, 5 row polished bracelet w/deployment buckle;

- S/Steel Michele mop chronograph bracelet watch having round mop roman/marker dial w/1-zone (sec), 2-row diamond pol bezel, pol case, dia accents on lugs, 7-row pol bracelet, deployment buckle, 140D=.58tw;

- S/Sil 18kyg John Hardy Jaisalmer Collection dot gold & silver bracelet with ss tube having 3 oval areas, ctr ovl being flat yg pol yg dots, next ovl having yg raised dots & ss dots, outer ovl being flat pol yg dots, wheat brac, yg dot clasp;

- S//Silver John Hardy Designs naga dragon head bracelet having rectangular woven chain with s/s carved dragon end w/blk saphs on top, s/s blk saph circle clasp, dragon's mouth opens in front to close on clasp, 7.25" length;

46

- 18kwg dia semi-mount having pave' dias around head, pave' dias f/b, sides having single half moon dia, shank having p/c dias halfway down shank, pave dias f/b shank RD=1.09tw, P/C=.47tw, HM=.57tw;

- Sterling Silver gts large woven link bracelet with chain clasp 8.5" length;

- 14kwg diamond stud earrings.

a.    At least $30,052,264.82 in United States Currency and all interest and proceeds traceable thereto.

j.    The government specifically provides notice of its intent to seek a personal money judgment against the defendant in the amount of the fraudulently-obtained proceeds.

3.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred, sold to, or deposited with, a third person;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property;

All in violation of Title 18, United States Code, Section 982(a)(7).

## NOTICE OF FRAUD FORFEITURE

1.    The allegations of Counts 23 through 26 of this Indictment are realleged and incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Sections

371, 1343, and 981(a)(1)(C), made applicable through Title 28, United States Code, Section 2461(c).

2.      As a result of the offenses alleged in Counts 23 through 26, defendants, **LISA A. CRINEL, WILNEISHA HARRISON JAKES, CLARA AITCH,** and **WENDY ERVIN,** shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), made applicable through Title 28, United States Code, Section 2461(c), any and all property, real or personal, which constitutes or is derived from proceeds traceable to violations of Title 18, United States Code, Sections 371 and 1343, including but not limited to:

      a.      At least $35,800.00 in United States Currency and all interest and proceeds traceable thereto.

      b.      The government specifically provides notice of its intent to seek a personal money judgment against the defendant in the amount of the fraudulently-obtained proceeds.

3.      If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third person;

      c.      has been placed beyond the jurisdiction of the Court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

All in violation of Title 18, United States Code, Sections 371, 1343, and 981(a)(1)(C),

made applicable through Title 28, United States Code, Section 2461(c).

A TRUE BILL:

PATRICE HARRIS SULLIVAN
ASSISTANT UNITED STATES ATTORNEY
Louisiana Bar No. 14987

ANDRE LAGARDE
ASSISTANT UNITED STATES ATTORNEY
Louisiana Bar No. 28649

SHARAN LIEBERMAN
ASSISTANT UNITED STATES ATTORNEY
New York Bar No. 4175865
District of Columbia Bar No. 502384

New Orleans, Louisiana
March 12, 2015

49

FORM OBD-34

No.____

# UNITED STATES DISTRICT COURT

Eastern    District of ____    Louisiana

Criminal ____    Division

## THE UNITED STATES OF AMERICA

vs.

LISA A. CRINEL, WILNEISHA HARRISON JAKES, HENRY EVANS,
THREASA ADDERLEY, MICHAEL JONES, PAULA JONES, SHELTON BARNES,
JONATHON NORA, CARY PAYTON, EVELYN ODOMS, SHEILA MATHIEU,
SUPRENIA WASHINGTON, ERICA EDWARDS, ZELLISHA DEJEAN, CAREN
BATTAGLIA, SHEILA HOPKINS, ELESHIA WILLIAMS, VERINESE SUTTON,
PCAH, INC. a/k/a PRIORITY CARE AT HOME, INC. (PCAH) d/b/a
ABIDE HOME CARE SERVICES, INC., CLARA AITCH, and WENDY ERVIN

## INDICTMENT

INDICTMENT FOR CONSPIRACY TO COMMIT HEALTH CARE FRAUD, CONSPIRACY TO DEFRAUD THE
UNITED STATES AND TO RECEIVE AND PAY HEALTH CARE KICKBACKS, CONSPIRACY TO COMMIT
WIRE FRAUD, HEALTH CARE FRAUD, WIRE FRAUD AND FORFEITURE

**VIOLATIONS:**   18 U.S.C. § 1349, 18 U.S.C. § 371, 18 U.S.C. § 1347,
18 U.S.C. § 1343, and 18 U.S.C. § 2

A true bill.

_____
Foreman

Filed in open court this _____ day,
A.D. 2015

_____
Clerk

Bail, $ _____

_____
PATRICE HARRIS SULLIVAN, Assistant United States Attorney