UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 15-61** |
| **VERSUS** | * | **SECTION: "E" (5)** |
| **EVELYN ODOMS** | * | |
| | * * * | |

## FACTUAL BASIS

If this matter were to proceed to trial, the United States would introduce the following facts with relevant and admissible testimony and exhibits to support the violation alleged in Count 17 of the indictment, a violation of Title 18, United States Code, Sections 1347 and 2 (aiding and abetting health care fraud):

Wendy Naquin from AdvanceMed, the Zone Program Integrity Contractor (ZPIC) over home health claims in this state, would testify that during all times mentioned in the indictment, Abide Home Care Services, Inc. (Abide) was enrolled as a provider able to bill Medicare for providing home health services to qualified beneficiaries.

Lee Ann Dodson would testify that that she is a registered nurse (RN) employed for ZPIC AdvanceMed as a team leader for the Home Health Agency Review Team. Dodson, who has testified as an expert in the field of home health, would testify that the home health benefit generally is for elderly or disabled beneficiaries who are acutely ill and for whom it is a taxing or considerable effort to get out of the home to receive medical care by going to a physician or an outpatient facility. Dodson would testify that a physician's order initiates home health and that



home health services cannot begin without such a referral. When a home health agency gets an order from a physician for home health services for a patient that physician sees, the agency sends out a registered nurse to do an assessment, known as an Outcome and Assessment Information Set (OASIS) to determine what type of skilled nursing the patient needs. The OASIS is very specific and consists mostly of objective multiple choice questions. The first thing the RN would determine is whether the patient is homebound. If the patient is not homebound, the RN would discontinue the assessment because the patient did not meet the first criteria for home health. Dodson would also testify that part of the OASIS is to determine the patient's diagnoses. Dodson would testify that some diagnoses result in higher reimbursements to the provider than other diagnoses. Other factors that are determined in the OASIS are whether the patient can perform certain activities of daily living, such a self-toileting. Generally, the sicker and the more disabled the patient was, the more the agency was reimbursed for providing services.

Dodson would testify that after the RN completes an OASIS for a patient, a plan of care (POC), also known as the CMS 485, is created. The POC contains the patients' diagnoses and medications, orders, what will be done for the patient, the goals and the discharge plan. The home health agency is supposed to send the POC to the patient's primary care physician, who is familiar with the patient's history and who ordered the home health services, for his signature. After the agency obtains the physician's signature, only then can the 60-day period of home health begin.

Dodson will finally testify that the national average for length of stay for Medicare beneficiaries in home health is two episodes, or 120 days of home health.

Special Agent Krista Bradford would testify that on March 25, 2014, a search warrant was executed at Abide. Documentation obtained at that search, including the employee file of Evelyn



Odoms, would establish that Odoms began her employment at Abide as a licensed practical nurse (LPN) on about February 20, 2006. Job descriptions obtained in the search of Abide would establish that LPNs at Abide were required to perform skilled nursing services under the supervision of a registered nurse. The LPN was to observe, record, and report the general physical and mental conditions of the patients, assist the physician and/or RN in performing specialized procedures, assist the patient with activities of daily living and encourage appropriate self-care, and prepare clinical and/or progress notes and incorporate them into the clinical record weekly. The evidence would establish that the job description applicable to Odoms followed the requirements of Medicare found in Paragraph 16 of the indictment.

Evidence provided by employees of Abide, representatives of AdvanceMed, an expert physician, and patients would establish that Abide routinely falsified diagnoses to cause inflated reimbursements, and falsified medical records fraudulently supporting home health for medically unnecessary home health services. Evidence would also establish that Abide relied on employees such as Odoms to compromise their independent medical judgment, observations and ethics to participate and turn a blind eye to the ongoing scheme to defraud Medicare.

A representative of AdvanceMed would testify that Abide billed Medicare for providing thirty (30) episodes of home health to Medicare beneficiary ArGi. These episodes included primary diagnoses of hypertension, aseptic necrosis, arthropathy, rheumatoid arthritis, pernicious anemia, stomach function disorder, acute URI, spasm of muscle, and Vitamin D deficiency. Pursuant to Medicare rules, the Abide home health nurses, primarily Odoms, was required to teach ArGi how to handle these diagnoses. However, evidence would establish that Odoms never observed ArGi exhibit symptoms of these diagnoses, and never treated ArGi for these diagnoses, and never taught ArGi about these diagnoses. Odoms admitted to law enforcement that she



documented teaching ArGi about primary diagnoses, as ordered by Abide personnel, such as rheumatoid arthritis, even though she knew ArGi did not have these conditions and she provided no teaching for them.

The patient chart of ArGi obtained from Dr. Michael Jones would indicate that he first saw ArGi in January 2013, when ArGi reported only high blood pressure.  ArGi reported no depression, sleeping irregularities, pain or headaches.  Dr. Jones last saw ArGi on May 17, 2013.  There are no notes in Dr. Jones' patient chart detailing the need for, or results of, the visit on May 17, 2013.  Notes from Dr. Jones from past visits with ArGi mentioned anemia, COPD, and controlled hypertension.  Dr. Jones also had cardiac and pulmonary tests performed on ArGi. Review of Dr. Jones' file would indicate no recorded observations of homebound status by ArGi. No documentation supporting home health admission would be found in the patient chart.

Dr. Jones billed Medicare Part B for home health care oversight on November 5, 2013, and listed a diagnosis of rheumatoid arthritis.  The bill submitted by Dr. Jones indicates that he was supervising ArGi through regular physician development and/or revision of the POC, engaging in review of the laboratory and other studies, communication, including telephone calls with other health care professional involved in the patient's care, integration of new information into the medical treatment plan and/or adjustment of medical therapy for thirty or more minutes in a one-month period.  However, Dr. Jones' patient file of ArGi would evidence none of these activities.

Dr. Wanda Timpton would testify that she began seeing ArGi on about February 27, 2014. Dr. Timpton's medical chart for ArGi would also be introduced into evidence.  Dr. Timpton's file would establish that ArGi's principal medical condition was the need for hip surgery because one leg was shorter than the other.



ArGi would testify that he/she was born in 1956 and received home health services from Abide for about three years. ArGi would testify that he/she has never suffered from or been diagnosed with rheumatoid arthritis, muscle spasms, incontinence, or low vision. ArGi would state that he/she wears reading glasses. ArGi would testify that he/she was discharged from Abide because he/she did not want them coming to his/her home. ArGi would testify that, while he/she was receiving home health services, a nurse came to his/her home twice per month to take his/her blood pressure. ArGi would testify that the visits lasted about ten or fifteen minutes. ArGi would testify that he/she did not have a license only because he/she needed new glasses but that his sisters drove him where he/she needed to go. ArGi would state that he/she was not confined to his home because he/she went out with friends or family at least weekly and walked his/her dog daily.

Records obtained from Abide would establish that Evelyn Odoms was the LPN providing home health services to ArGi beginning in May 2009, through February 26, 2014. Despite weeks of recording normal blood pressure readings for ArGi, Odoms deliberately ignored her independent medical judgment and her observations and continued to "teach" ArGi about abnormal blood pressure because the POC falsely listed hypertension exacerbations as the primary diagnosis for home health. Odom then falsely and intentionally documented such teaching. Records from Abide would establish that Odoms intentionally recorded that she "taught" ArGi about other diagnoses that he/she did not have, including stomach function disorder, acute upper respiratory infections, arthropathy, muscle spasms, rheumatoid arthritis, neuropathy, uncontrolled hypertension, and vitamin D deficiency. During home health episode December 29, 2013, through February 26, 2014, the POC falsely listed that ArGi had a diagnosis of RA and Odoms intentionally completed false notes indicating that she instructed ArGi on what measures to take to decrease pain caused by rheumatoid arthritis. Testimony from employees of Abide would

establish that if the notes from the LPNs did not reflect that the LPN was teaching to the primary diagnosis, whether or not the diagnosis applied to the patient, the LPN would have to redo the notes to falsely reflect teaching that the LPN knew she did not do. In some cases, if the notes were not falsified as ordered, the LPN would not receive her paycheck. Evidence would show Odoms was aware that if she did not falsify home health documentation as required by Crinel and Odoms' supervisors, she would be fired.

      Odoms deliberately closed her eyes to what would otherwise have been obvious to her, as she was subjectively aware of a high probability that her actions were illegal and purposely tried to avoid learning more about the illegal conduct. She intentionally turned a blind eye to the ever-changing falsified diagnoses (provided to her by supervising RNs and case managers), and Odoms falsely documented home health services based upon these fraudulent diagnoses. The Government would establish Odoms' subjective awareness that her actions were illegal, in part, through the individual testimony of occupational and physical therapists who visited ArGi on the same day in January 2013. These two therapists would testify that ArGi did not know why Abide was sending the therapists to see him/her, that ArGi was putting off a knee replacement, the patient had no stomach disorders, ArGi was independent with his/her activities of daily living and functional mobility, had no functional goals to meet at the time of the visit, and was not a candidate for occupational or physical therapy. Odoms' continuing knowledge of the ongoing fraud would further be proven by the fact that she visited ArGi on the same day as the two therapists and, had she not been purposely participating in the long-term Abide health care fraud, would have noted that ArGi was not homebound, and had no need for any home health services. Instead, Odoms intentionally drafted false notes supporting stomach function disorder, a condition ArGi told one therapist that same day that he/she did not have.

Payroll records would demonstrate that, between March 18, 2008, through March 14, 2014, Abide paid Odoms approximately $193,262.62 for providing home health services that she falsely documented and which were largely medically unnecessary.

Billing data provided by Advance Med would show payments to Abide for the six visits Evelyn Odoms made to ArGi for the episode of home care charged in Count 17 of the indictment. Abide billed $1,200.01 for the episode and was paid $2,055.49. Odoms admits and agrees that this was her part in the overall health care fraud scheme, in that she knowingly and intentionally aided and abetted Abide, Crinel and others in creating materially false documents Medicare required and relied upon in reimbursing Abide for health care claims

KENNETH ALLEN POLITE, JR.
UNITED STATES ATTORNEY

*[signature]*
PATRICE HARRIS SULLIVAN
SHARAN LIEBERMAN
ANDRE LAGARDE
Assistant United States Attorneys

*[signature]*
EVELYN ODOMS
Defendant
Date: 7/22/15

*[signature]*
MICHAEL KENNEDY
Counsel for Defendant
Date: 7/22/15